## AFFIDAVIT OF MATTHEW M. HARTMANN

I, Matthew M. Hartmann, a Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby state the following:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent with the Federal Bureau of Investigation (hereinafter, "FBI") since 1999. Currently, I am assigned to the Cleveland Division's Youngstown Resident Agency. In that capacity, I have been involved in numerous investigations including terrorism matters, threats, threats by mail, and mail fraud.

2. As an FBI Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of Rule 4 and Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am engaged in the enforcement of criminal laws and is within a category of officers authorized by the Attorney General to request and execute arrest and search warrants pursuant to Title 18, United States Code, Sections 3052 and 3107; and DOJ regulations set forth at Title 28, Code of Federal Regulations, Sections 0.85 and 60.2(a).

3. This affidavit is offered in support of an application for a warrant to seize a DNA standard from the saliva of ANTHONY J. NATALE (hereinafter, "NATALE"), as described more fully in Attachment B. The person to be searched is NATALE, as identified more fully in Attachment A.

4. Based on the information set forth herein, I submit there is probable cause to believe that NATALE violated federal law; Title 18, United States Code, Sections 1038(a)(1) and 2332a(a)(2) (Hoax Use of a Weapon of Mass Destruction). I further submit the information contained in this Affidavit establishes probable cause that NATALE's DNA will provide evidence to support that NATALE did in fact violate federeral law.

5. Based on my education, training, and experience, I know that skin, saliva, blood, and/or hair evidence left behind at a crime scene contain a unique DNA profile that can often be identified by forensic scientists when those scientists compare the evidence to a known standard. I know that when individuals wear clothing or handle an item such as a glove or purse, they may leave behind secretions and/or skin cells that contain their unique DNA profile. I also know from my education, training, and experience, that oral swabs taken from an individual will contain a known standard of that person's DNA profile. This standard can then be compared to an unknown standard by a forensic scientist in an effort to identity an unknown DNA sample.

6. The statements in this Affidavit are based on information provided by witensses, other law enforcement officers, and my investigation of this matter. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that a violation of Title 18, United States Code, Sections 1038(a)(1) and 2332a(a)(2) has been committed.

## DEFINITIONS

7. Title 18, United States Code, Section 2332a(a) make it an offense for a person to use, threaten, attempt, or conspire to use a weapon of mass destruction. A "weapon of mass destruction" (hereinafter, "WMD") is defined in Title 18, United States Code, Section 2332a(c) as any weapon designed of intended to cause death of serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors; or any weapon involving a biological agent, toxin, or vector.

### HISTORY ON WHITE POWDER LETTERS

8. The 2001 anthrax attacks in the United States occurred over the course of several weeks beginning on Tuesday, September 18, 2001, one week after the September 11, 2001 attacks. Letters containing anthrax spores were mailed to several news media offices and two U.S. Senators, killing five people and infecting 17 others. In the months and years following the 2001 attacks, thousands of letters had been mailed that were intended to mimic the anthrax letters. These letters often contained a white powdery substance and have become known by law enforcement as "white powder letters" (hereinafter: WPL). Although the vast majority of WPLs are found to contain harmless materials, some have included hazardous chemicals or poisons. Several letters mailed were found to contain ricin; a highly toxic white powder that can cause severe allergic reactions and death. Although the vast majority of WPLs are hoaxes, law enforcement and public safety services respond to each incident as if the WPL contained the most highly toxic substances such as anthrax or ricin.

### CASE BACKGROUND

9. The American Business Center, located at 7677 South Avenue, Boardman, Ohio (hereinafter, "ABC") provides copying machine sales and service in the Mahoning Valley. On November 12, 2014, at approximately 1:30 p.m., an ABC employee was going through the daily mail when he opened an envelope containing a white powdery substance.

### PROBABLE CAUSE

10. In early October 2013, ABC hired NATALE as a sales representative. NATALE was assigned a sales quota and a sales region. Over the next year, NATALE never met his sales quota. On October 6, 2014, NATALE was terminated for lack of performance. Upon learning of his termination, NATALE became very irate. Specifically, NATALE yelled and slammed

3

desk drawers. The supervisor believed NATALE had anger management issues, and he had a concern that NATALE might become violent. NATALE stormed out of his supervisor's office and sped out of the company's parking lot.

11. Shortly thereafter, the supervisor received text messages sent from a cell phone number he knew NATALE to use. The message read: "I hope you die from cancer of the eys" (sic).

12. On October 7, 2014, the supervisor responded to NATALE's text message by asking NATALE not to have any further contact with him. NATALE responded in two additional messages. The first read "So how do I get my stuff back?" and the second read "We will discuss it tonight at your place". These texts messages and NATALE's anger issues concerned the supervisor who made a harassment complaint to his local police department.

13. ABC had a legal obligation to inform NATALE of his options regarding his ability to continue his health insurance. On or about October 16, 2014, ABC sent NATALE a letter informing him of his options. The letter was mailed to NATALE's home address. The letter requested that NATALE either elect to continue his health coverage by taking over the premium payments or to decline the coverage. NATALE was to sign the letter and return it to ABC within 31 days.

14. On November 12, 2014, ABC received an envelope mailed via the United States Postal Service. The envelope was hand addressed. An ABC employee opened the envelope to find the health insurance paperwork ABC had sent NATALE. The envelope also contained a white powder which fell from the letter and envelope onto the employee's lap, his desk and the floor in front of his desk.

15. The employee called his supervisor who entered the employee's office. The

4

supervisor, wearing latex gloves, placed the envelope and letter into a larger envelope and then called the police. Within a short time, the police, fire department and the county hazardous materials ("HazMat") response team arrived on scene.

16. The employee and supervisor were disrobed and decontaminated. Their clothes and personal items were secured in bio-hazard bags. Both individuals were transported to the hospital for medical evaluations. The HazMat team collected the larger envelope and other documents that were on the desk as evidence. Those items were transported to the Ohio Department of Health laboratories for testing. Initial testing found no pathogens or toxins present. On November 19, 2014, final test results were obtained and they confirmed the initial findings.

17. Further investigation revealed that the letter sent along with the white powder was signed in NATALE's name and dated in blue ink. I compared the signature on the letter to a known example of NATALE's signature found within his personnel file at ABC. The signatures appear nearly identical.

18. I know through training and experience that a person who handles paper items, such as the envelope and letter described above, can transfer identifying evidence in the form of DNA from their person to these items.

19. DNA is often found in dead skin cells and saliva. Dead skin cells can be transferred from a person to an object simply by touching that object. If a person were to moisten the adhesive strip on an envelope like the one received by ABC by licking it, that person's skin cells can be transferred via the person's saliva and adhered to the envelope. A person's skin cells and DNA can also be transferred to the adhesive on the back of a postage

stamp as the stamp is applied to an envelope. Adhesive postage stamps were affixed to the letter received by ABC.

## CONCLUSION

20. Based on the investigation outlined above, there is probable cause to believe that ANTHONY J. NATALE, violated Title 18, United States Code, Sections 1038(a)(1) and 2332a(a) by sending a WPL, via the United States mail, to ABC; a WPL that was intended to threaten the use of a WMD. There is also probable cause to believe that evidence of NATALE's activities will be found in his DNA.

21. I respectfully request that the Court issue a search and seizure warrant for the collection of a DNA buccal swab, as described in Attachment B, from the person of NATALE, as described in Attachment A.

_____
Matthew M. Hartmann
Special Agent, Federal Bureau of Investigation


Sworn and subscribed before me this 10 day of August, 2015.

_____
George J. Limbert
United States Magistrate Judge